NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

VALARIE VEGA,

      *Plaintiff*,

    v.

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant.*

Civil Action No. 23-23203

OPINION

**ARLEO, UNITED STATES DISTRICT JUDGE**

THIS MATTER comes before the Court by way of Plaintiff Valerie Vega's ("Plaintiff") request for review of Administrative Law Judge ("ALJ") Ricardy Damille's decision regarding Plaintiff's application for Supplemental Security Income Benefits ("SSI") pursuant to 42 U.S.C. §§ 1383(c)(3), 423, and 405(g).  See ECF No. 1.  For the reasons set forth in this Opinion, the Commissioner of Social Security's (the "Commissioner") decision is **AFFIRMED**.

**I.      STANDARD OF REVIEW AND APPLICABLE LAW**

    **A.      Standard of Review**

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  The Commissioner's application of the law is subject to plenary review.  See Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).  The Commissioner's factual findings, however, are binding upon this Court if they are supported by "substantial evidence" in the administrative record.  See Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Stated differently, substantial evidence consists of "more than a mere

1

scintilla of evidence but may be less than a preponderance." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).  It is a deferential standard of review that prohibits the Court from "weigh[ing] the evidence or substitut[ing] its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992); see also Stockett v. Comm'r of Soc. Sec., 216 F. Supp. 3d 440, 453 (D.N.J. 2016) (explaining that the court "must uphold" factual findings based on substantial evidence, "even if the court would have decided the inquiry differently" in the first instance (quotation marks omitted)).

In determining whether there is substantial evidence to support the Commissioner's decision, the Court must consider:  "(1) the objective medical facts; (2) the diagnoses of expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the Plaintiff and corroborated by family and neighbors; and (4) the Plaintiff's educational background, work history, and present age."  Holley v. Colvin, 975 F. Supp. 2d 467, 475 (D.N.J. 2013), aff'd 590 F. App'x 167 (3d Cir. 2014).  The ALJ's analysis of the evidentiary record is sufficient so long as it "permit[s] [for] meaningful review."  Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  Accordingly, the ALJ does not need to have discussed "every tidbit of evidence included in the record,"  Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004), but he must have "consider[ed] all pertinent medical and non-medical evidence and 'explain[ed] [any] conciliations and rejections'" of that evidence,  Stockett, 216 F. Supp. 3d at 454 (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000)).

**B.      The Five-Step Disability Test**

The Social Security Act ("the Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1).  To determine whether a claimant is

disabled under the Act, the Commissioner applies a five-step test. See 20 C.F.R. § 416.920. The claimant bears the burden of proof at steps one through four. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five. See id.

At step one, the Commissioner must determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i); 20 C.F.R. § 416.920(b). Substantial gainful activity involves significant mental or physical activities that are "usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972. If the claimant is engaged in such activity, they are not "disabled" under the Act and the benefits are denied. Bowen, 482 U.S. at 140. If the claimant is not engaged in such activity, the Commissioner must proceed to step two and determine whether the claimed impairment—or combination of impairments—is "severe." 20 C.F.R. § 416.920(a)(4)(ii). A "severe" impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). The claimant's severe impairment must also last or be expected to last "for a continuous period of at least 12 months." 20 C.F.R. § 404.1505. If the claimant does not have a medically determinable severe impairment, the benefits are denied. See Bowen, 482 U.S. at 141.

At the third step, the Commissioner must determine whether the claimant's condition is equivalent to a medical impairment enumerated in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). See 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. § 416.920(d). If the condition meets or equals one of the listed impairments, "the claimant is conclusively presumed to be disabled." Bowen, 482 U.S. at 141. If not, the Commissioner proceeds to step four. See id. The Commissioner must first assess the claimant's "residual functional capacity" ("RFC") based on the relevant medical and other evidence included in the record. See 20 C.F.R. § 416.945. Once the claimant's RFC is ascertained, the Commissioner then must determine whether the claimant

3

can still perform their past relevant work. See C.F.R. § 416.920(a)(4)(iv); 20 C.F.R. § 416.920(e). If the claimant can perform their past relevant work, the claim for benefits must be denied. See 20 C.F.R. § 416.960(b)(3). If not, the analysis continues to the fifth step.

At the fifth step, the Commissioner considers whether "work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] residual functional capacity and vocational factors." 20 C.F.R. § 416.960(c)(2); see also id. § 416.920(a)(4)(v). The Commissioner may seek the assistance of a vocational expert at this step. Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999) (internal citation omitted).

## II.    BACKGROUND

### A.    Overview

Plaintiff filed for SSI on September 9, 2019. See ECF No. 5, Administrative Transcript ("Tr.") at 223–28. The application was denied initially and upon reconsideration. See id. at 83–87, 93–95. Plaintiff subsequently requested a hearing before an ALJ, which occurred on July 15, 2022. See id. at 35–59, 96–97. Plaintiff and an impartial vocational expert testified. See id. at 35–39. Plaintiff was represented by counsel at the hearing. See id. at 37. On October 21, 2022, the ALJ denied Plaintiff's application for benefits at the fifth step of the disability evaluation. See id. at 19–29. On October 20, 2023, the Appeals Council denied Plaintiff's appeal. See id. at 1–6. Plaintiff then initiated the instant action. See ECF No. 1.

### B.    Plaintiff's Medical History

Plaintiff was born on November 2, 1979. See Tr. at 40. Plaintiff alleges that the onset date of her disability was February 1, 2019. See id. at 60–61. Plaintiff completed a high school education and has prior work experience as a registration clerk and a room service clerk. See id. at 41, 53.

1.      **Plaintiff's Mental Impairments: Major Depressive Disorder, Generalized Anxiety Disorder, and PTSD.**

Plaintiff engaged Trinitas Regional Medical Center ("Trinitas") for outpatient treatment of protracted mental health conditions in February 2019. See id. at 373–74. Plaintiff reported fluctuations in mood, restlessness, nervousness in groups, and lack of concentration due to excessive stress. See id. at 380. Notwithstanding her anxious mood and constricted affect, Plaintiff exhibited normal speech, good eye contact, a cooperative attitude, relevant and logical thought processes, and true emotional insight during her mental status examination. See id. at 376–77. Accordingly, Plaintiff was diagnosed with major depressive disorder and generalized anxiety disorder by Advanced Practice Nurse Patrick Oledimmah ("APN Oledimmah"). See id. at 380. To mitigate Plaintiff's symptoms, APN Oledimmah prescribed Prozac and referred Plaintiff for individual therapy. See id. at 381, 405, 415–17, 591–92. Shortly thereafter, Plaintiff was prescribed Vistaril to address sleep and anxiety related issues. See id. at 384. Plaintiff responded well to the medication, reporting improvement in her symptoms, mood, and affect over the following months. See id. at 389–98, 429–30.

On April 15, 2019, Plaintiff sought concurrent outpatient treatment from True Care Mental Health ("True Care"). See id. at 414. After approximately nine months, on January 25, 2020, Plaintiff was discharged. See id. at 416. On this date, Licensed Clinical Social Worker Elaina Bruno ("LCSW Bruno") performed a final mental status exam on Plaintiff. See id. at 416–17. Plaintiff exhibited speech that was normal in rate and volume; her articulation was coherent and spontaneous; and her mood presented as normal with no signs of depression. See id. Her reasoning and thought processes appeared appropriate. See id. She exhibited no signs of hyperactive or attentional difficulties. See id. Plaintiff's short- and long-term memory were also "intact." Id.

5

LCSW Bruno noted that at the time of Plaintiff's discharge, she was diagnosed with unspecified post-traumatic stress disorder ("PTSD") and moderate major depressive disorder.  See id.

As of February 3, 2020, Plaintiff was sleeping well, her medication was working well, and her mood was stable.  See id. at 450–51.  At this appointment, Dr. Oledimmah "strongly emphasized" the need for Plaintiff to adhere to her medication regiment.  Id. at 450.  However, following the onset of the COVID-19 pandemic, Plaintiff stopped taking her medications daily and began to suffer an increase in panic attacks, racing thoughts, stress, and anxiety.  See id. at 453–56.  Plaintiff's bout of symptoms subsided by June 2020, when she reported taking her medications "as prescribed."  Id. at 457.  At this point, she characterized her depression and anxiety as "mild."  Id. at 457–58.

In response to her wave of increased symptoms, in April 2020, Plaintiff also resumed therapy with LCSW Bruno.  See id. at 586.  She continued therapy treatment sessions through July 13, 2022.  See id. at 583–92.  During this time, Plaintiff made progress toward achieving her long-term goal of developing healthy cognitive patterns to ameliorate symptoms of anxiety and depression.  See id. at 583–84, 592.  On July 15, 2022, LCSW Bruno completed a mental assessment of Plaintiff's ability to perform work related activities.  See id. at 594–96.  LCSW Bruno characterized Plaintiff's ability to follow rules, use judgment, function independently, carry out complex job instructions, behave in an emotionally stable manner, and demonstrate reliability, as "good" (satisfactory).  See id.  Plaintiff's ability to relate to and interact with co-workers, deal with the public, deal with work stress, and maintain attention/concentration was deemed "fair" (seriously limited but not precluded).  See id.

### 2. Plaintiff's Physical Impairments: Type 2 Diabetes Mellitus and Obesity.

Preceding the period relevant to Plaintiff's claim—beginning with the alleged onset of Plaintiff's disability on February 1, 2019—Plaintiff's primary care physician, Sukhjender Goraya,

M.D. ("Dr. Goraya"), treated Plaintiff for Type 2 Diabetes Mellitus. See id. at 506, 512, 517, 521, 532–533, 538, 543, 548, 553, 559, 565, 573. Dr. Goraya described Plaintiff's Diabetes Mellitus as "without complications." Id. Dr. Goraya regularly prescribed Plaintiff with Metformin (500mg) beginning January 24, 2017. See, e.g., id. at 508, 515, 560, 574.

On November 18, 2019, Dr. Goraya recorded Plaintiff's weight as 207 pounds–equating to a body mass index ("BMI") of 40.4. See id. at 548. Plaintiff's medical records indicated no cardiovascular, musculoskeletal, respiratory, or endocrine issues attributable to her weight. See id. at 510, 513, 519, 523–24, 526, 528–29, 541–42, 549, 556–57, 563, 567. On June 17, 2020, Plaintiff underwent bariatric surgery for weight loss. See id. at 453, 455, 457. As of April 1, 2022, Plaintiff weighed 134 pounds. See id. at 578.

### 3.    Expert Opinions on Plaintiff's Conditions.

On November 21, 2019, Thomas Clark, Ph.D. ("Dr. Clark"), reviewed Plaintiff's medical records and opined as to how her mental impairments could affect workplace performance. See id. at 65–69. Despite diagnoses of depression, anxiety, and PTSD, Dr. Clark determined that Plaintiff could carry out complex instructions; work with others to complete routine tasks; persist at tasks within skill levels for an eight-hour day; and adapt to the mental demands of unfamiliar assignments. See id. at 68. On February 12, 2020, Dr. Joseph Wieliczko, Psy.D. ("Dr. Wieliczko"), evaluated Plaintiff's medical records and affirmed Dr. Clark's determinations. See id. at 76–81.

Separately, on November 20, 2019, Lloyd Marks, M.D. ("Dr. Marks"), reviewed Plaintiff's medical records and determined that her Diabetes Mellitus was medically controlled and "[n]ot severe." Id. at 65. On February 11, 2020, Elois Phillips, M.D. ("Dr. Phillips"), evaluated Plaintiff's medical records and affirmed Dr. Marks' determination. See id. at 76. Neither expert made note of Plaintiff's weight or BMI. See id. at 63–65, 73–76.

**C.      The ALJ's Decision**

On October 21, 2022, the ALJ issued his decision. See id. at 19–29. He concluded that Plaintiff was not "disabled" at step five of the sequential evaluation process. See id. at 29.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 9, 2019—the date upon which Plaintiff filed for SSI. See id. at 21.

At steps two and three, the ALJ found Plaintiff suffered from the following severe impairments: (1) depressive disorder; (2) anxiety disorder; (3) and PTSD. See id. at 21–22. The ALJ further concluded that Plaintiff suffered from the following non-severe impairments: (1) obesity; and (2) diabetes. See id. at 22. After considering the impairments separately and in combination, the ALJ determined that they did not medically equal the severity of one of the listed impairments in Appendix 1. See id. at 22–24.

With respect to Plaintiff's RFC, the ALJ found that Plaintiff retained the capacity to "perform a full range of work at all exertional levels" with specific non-exertional limitations. Id. at 24. The ALJ determined that Plaintiff: (1) "is able to understand, remember, and carry out simple instructions;" (2) "is restricted to work involving few workplace changes and occasional decision-making;" and (3) "can have occasional interaction with supervisors, coworkers, and the public." Id.

At steps four and five, the ALJ found that although Plaintiff could not perform past relevant work, the testimony of a vocational expert indicated that Plaintiff could perform other work in the national economy as a hand packager, store laborer, or package sorter. See id. at 27–28, 54. Accordingly, the ALJ determined that Plaintiff was not disabled and could not qualify for SSI. See id. at 28–29.

**III.**      **ANALYSIS**

In challenging the ALJ's decision, Plaintiff raises four main arguments:  (1) the ALJ's findings at step two were not based on substantial evidence; (2) the ALJ's findings at step three were not based on substantial evidence; (3) the ALJ failed to provide an adequate explanation for Plaintiff's RFC; and (4) the ALJ failed to consider relevant vocational testimony and Plaintiff's moderate limitations at step five.  As explained below, the Court disagrees with each of these assertions.

**A.      Findings at Step Two**

Plaintiff first argues that the ALJ's determination at step two was erroneous, stating that the ALJ "eliminate[d] [Plaintiff's diagnosis of diabetes and obesity] without providing any reason for the proposition other than an empty, foundationless assertion that they do not limit work related activities."  ECF No. 6 ("Pl.'s Br.") at 10.  The Court disagrees.

Diagnoses alone do not provide a basis for determining the severity of an individual's conditions.  See Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 (3d Cir. 2007).  Instead, a claimant must also provide evidence that an impairment "significantly limit[s] [the claimant's] ability to do basic work activities or impair[s] [the claimant's] capacity to cope with the mental demands of working."  Id. at 145 (citing 20 C.F.R. §§ 404.1520, 404.1521(a)) (emphasis in original).  Regarding obesity, "[n]o specific weight or BMI establishes obesity as a 'severe' or 'not severe' impairment."  Evaluating Cases Involving Obesity, 84 Fed. Reg. 22924, 22925 (May 20, 2019) ["SSR 19-2p"].  The ALJ must "consider all evidence from all sources" in making his determination.  Id.

Here, the ALJ indicated that he considered medical records provided by Dr. Goraya and concluded that Plaintiff's obesity and diabetes caused no more "than [a] minimal limitation in the claimant's ability to perform basic work activities for [the] 12 consecutive months relevant to th[e]

decision." Tr. at 22. Substantial evidence exists to support that conclusion. With respect to diabetes, the ALJ noted that Plaintiff's medical records characterize her condition as "without complications." Id. at 22; see also, e.g., id. at 506, 517, 532, 543, 559, 573. Those records also indicate Plaintiff has been prescribed a daily dose of 500mg of Metformin since January 24, 2017, suggesting that her diabetes-related symptoms are mitigated with medication. See id. at 508, 515, 574. This assumption is affirmed by testimony at the July 15, 2022 hearing, where Plaintiff's counsel emphasized that the only impairments causing Plaintiff to experience symptoms restricting her ability to work are her depression and anxiety. See id. at 39–40; see also id. at 35–59 (no mention of symptoms arising from Plaintiff's diabetes interfering with her ability to work).

Furthermore, Plaintiff's reliance on her BMI of 40+ as evidence of a severe impairment is unavailing. See Pl.'s Br. at 10. While a BMI in excess of 40 could impact a claimant's ability to work, the ALJ must consider the actual limitations caused by a claimant's symptoms—such as pain or fatigue. See Evaluating Cases Involving Obesity, 84 Fed. Reg. at 22925. Here, Plaintiff's medical records describe pain resulting from obesity prior to her bariatric surgery (which occurred on June 17, 2020). See Tr. at 418. However, following the surgery, Plaintiff's weight dropped from 207 to 134 pounds. See id. at 549, 578. This significant weight loss ostensibly alleviated Plaintiff's pain, as neither she nor her counsel mentioned work prohibitive symptoms stemming from her weight during the hearing. See id. at 35–59.

In short, the ALJ's decision at step two is consistent with the objective medical evidence and testimony in the record and is based on "more than a mere scintilla" of evidence. McCrea, 370 F.3d at 360. It is therefore owed deference from this Court.

## B.    Findings at Step Three

Plaintiff next argues that the ALJ's determination at step three was erroneous because he proffered a "one-sided, cherry picked set of irrelevancies" to justify his conclusion that Plaintiff

10

did not satisfy the requisite paragraph B criteria, and provided nothing more than a conclusory statement to justify his conclusion that the Plaintiff did not meet the paragraph C criteria. Pl.'s Br. at 25. In doing so, Plaintiff presses that the ALJ also ignored evidence in the record that satisfies the paragraph B requirements. See id. at 16–17, 21. The Court again disagrees.

At step three, the ALJ determined that Plaintiff's severe mental impairments—depressive disorder, anxiety disorder, and PTSD—most closely aligned with Listings 12.04, 12.06, and 12.15, respectively. See Tr. at 22. To be considered medically equivalent to one of these listings, the Plaintiff's impairments therefore must satisfy the requirements of paragraphs A and B of each listing, or paragraphs A and C of each listing, as specified under Appendix 1. See 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

The paragraph B criteria represent four main areas of mental functioning, focusing on one's ability to: (1) understand, remember, or apply information ("Criterion B1"); (2) interact with others ("Criterion B2"); (3) concentrate, persist, or maintain pace ("Criterion B3"); and (4) adapt or manage oneself ("Criterion B4"). See id. § 404, Subpart P, Appendix 1, Part A 12.00(A)(2)(b), 12.00(E)(1)–(4). Paragraph B is satisfied if the ALJ determines that a claimant's impairments result in an "extreme" limitation in one of these Criterion or a "marked" limitation in two of these Criteria. Id. § 404, Subpart P, Appendix 1, Part A, 12.00(A)(2)(b). A limitation is "extreme" when it restricts a claimant from "function[ing] independently, appropriately, effectively, and on a sustained basis." Id. at § 404, Subpart P, Appendix 1, Part A, 12.00(F)(2)(e). A limitation is "marked" when a claimant's ability to "function independently, appropriately, and effectively on a sustained basis is seriously limited." Id. at § 404, Subpart P, Appendix 1, Part A 12.00(F)(2)(d).

The paragraph C criteria evaluate whether a mental impairment is "serious and persistent." See id. at § 404, Subpart P, Appendix 1, Part A, 12.00(A)(2)(c). They require a claimant to show:

11

(1) she suffers from a serious and persistent mental disorder (i.e., a disorder occurring over a period of at least two years) that requires ongoing mental treatment to "diminish the symptoms and signs of [the claimant's] mental disorder"; and (2) that "despite [the claimant's] diminished symptoms and signs, [the claimant has] achieved only [a] marginal adjustment" in their condition. Id. at § 404, Subpart P, Appendix 1, Part A 12.00(G)(2)(a)–(c).

Here, the ALJ's decision ostensibly acknowledged that Plaintiff satisfied the paragraph A criteria and only focused on assessing whether she satisfied the paragraph B or paragraph C criteria. See Tr. at 22–23. Plaintiff challenges the ALJ's consideration of three of the Paragraph B criteria: Criterion B2, B3, and B4. See Pl.'s Br. at 14–23. She also contests his analysis of the Paragraph C criteria as boilerplate and conclusory. See id. at 24–25. The Court assesses each argument in turn.

### 1.    Plaintiff's Ability to Interact with Others (Criterion B2).

The ALJ found that Plaintiff's recognized impairments had only moderate limitations on her ability to interact with others, citing Plaintiff's January 25, 2020 mental status exam for support. See Tr. at 23. This conclusion is supported by substantial evidence. During that January 2020 examination, LCSW Bruno noted that Plaintiff's speech was "normal in rate, volume, and articulation and [was] coherent and spontaneous." Id. at 416. Plaintiff's affect was appropriate and consistent with her mood. See id. And her behavior was described as "cooperative" and lacking "gross [] abnormalities." Id. at 417.

Plaintiff argues that this conclusion is based on "cherry-picked evidence." Pl.'s Br. at 18–20. But it is in fact consistent with other medical evaluations contained in the administrative record. For example, Dr. Clark's evaluation found that Plaintiff could cooperate on routine tasks, accept directions and feedback, and relate with others despite her anxious avoidance. See id. at 68. Dr. Wieliczko similarly determined that Plaintiff was able to "cooperate in carrying out routine

12

or structured tasks and transactions" during his reconsideration of Dr. Clark's evaluation. Id. at 77. This is sufficient to satisfy the substantial evidence threshold warranting this Court's deference.

### 2. Plaintiff's Ability to Concentrate, Persist, or Maintain Pace (Criterion B3).

Although Plaintiff's mental impairments caused some limitations in concentration, the ALJ concluded that she did not experience "serious difficulty concentrating during medical examinations." Tr. at 23. This conclusion, too, is supported by substantial evidence. The ALJ again cited to Plaintiff's January 2020 mental status exam, during which Plaintiff exhibited "no signs of hyperactive or attentional difficulties." Id. at 416–17. Although not explicitly cited, Plaintiff's medical records reinforce the conclusion that she can maintain sustained focus and does not suffer from "attentional difficulties." See e.g., id. at 255, 393, 397, 429, 457, 512. And the assessments of Dr. Clark and Dr. Wieliczko provide further support for this determination. See id. at 66, 68, 77–79.

Plaintiff argues that the ALJ improperly focused on factors irrelevant to her recognized impairments. See Pl.'s Br. at 15–16. She correctly points out that the ALJ's Criterion B3 analysis appears to have conflated symptoms associated with Listing 12.03 (schizophrenia spectrum and other psychotic disorders) and symptoms associated with Listings 12.04, 12.06, and 12.15 (i.e., Plaintiff's impairments). But this the Court's "primary concern has always been the ability to conduct meaningful judicial review." Albury v. Comm'r of Soc. Sec., 116 F. App'x 328, 330 (3d Cir. 2004). Here, the Court concludes that any error made in analyzing the Criterion B3 factors was harmless because the ALJ's conclusion on this Criterion "is still supported by substantial evidence" in the administrative record, "and the ALJ's decision is explained in sufficient detail to allow [for] meaningful review" by this Court. Id.

### 3. Plaintiff's Ability to Adapt and Manage Herself (Criterion B4).

The ALJ determined that Plaintiff could adequately manage herself because "medical evidence of record shows [Plaintiff] did not usually have serious problems with adaptation and managing herself." Tr. at 23. The record, again, contains evidence supporting that determination. The ALJ again principally cited to Plaintiff's January 2020 mental status exam to support this proposition. See id. And this finding is, like the ALJ's other determinations, consistent with other medical evidence in the record. For example, Dr. Clark found that Plaintiff could "adapt to most changes and task demands on a sustained basis," and that her "[a]daptive skills are adequate and independent within physical tolerances." Id. at 68. Dr. Wieliczko reached a similar conclusion. See id. at 79.

Plaintiff responds by arguing that her history of mental impairments limits her ability to adapt to the demands of a job, a view she claims is supported by her inability to earn more than $20,000 in any year between 2000 and 2019. See Pl.'s Br. at 20–21 (citing Tr. at 236). But she never provides evidence to tie her low earnings over this period of time to her inability to adapt to work demands—she just states a causal relationship exists between the two ipse dixit. That is not a sufficient basis to reverse an ALJ determination that is otherwise supported by substantial medical evidence in the record.

### 4. Paragraph C Criteria

Finally, the ALJ found that Plaintiff's medical records do not show "serious and persistent" symptoms based on her impairments because "medical treatment diminishes the signs of [Plaintiff's] mental disorders" and provides more than a "marginal adjustment" in her ability to adapt to changes in her environment. Tr. at 23–24. That determination, too, is supported by substantial evidence. See, e.g., id. at 384, 389–98, 429–30, 414–17, 453–58, 583–92, 594–96.

14

Plaintiff argues that the ALJ's determination relied on "conclusory statements without any attempt to offer a meaningful discussion" of the paragraph C criteria. Pl.'s Br. at 25. Although the ALJ did not provide a robust analysis of his paragraph C determination at step three of his disability analysis, he expounded upon the ways in which medical treatment helped Plaintiff regulate her symptoms when assessing Plaintiff's RFC at step four. See Tr. at 25–26. This aligns with Third Circuit precedent which allows an ALJ to present substantive findings elsewhere in his or her decision, so long as the record is sufficiently developed to allow for meaningful review. See Jones, 364 F.3d at 505 (explaining that an ALJ does not need to "use particular language or adhere to a particular format in conducting his analysis").

Here, the ALJ's analysis satisfied this bar. At step four, he detailed how Plaintiff's medication regiment resulted in positive symptom response and was generally "working well." Id. at 25, 418–20, 450. Additionally, he noted that Plaintiff can "cook, clean, [] drive, and go[] grocery shopping when she needs to." Id. at 25. This exemplifies Plaintiff's ability to adjust to variable demands in her daily routine with the assistance of her medication. He also noted how Plaintiff experienced an onset of more severe symptoms when she deviated from her treatment regiment, but returned to a more stable situation when she began again taking her medicine "as prescribed" and resumed therapy sessions. See id. at 25–26; see also id. at 450, 453–57, 583–92. This is sufficient evidence and analysis to conclude Plaintiff's impairments are manageable and not persistently debilitating when treated. And it is further bolstered by other medical evidence in the record, such as LCSW Bruno's opinion that Plaintiff's ability to act reliably, function independently, and use judgment outside of the domestic sphere were all "good." Id. at 594–95.

* * *

15

In sum, the Court finds that the record contains substantial evidence to support the ALJ's determination that Plaintiff was unable to satisfy either the paragraph B or paragraph C criteria associated with her specific impairments. His conclusion that Plaintiff does not have an impairment that medically equals the severity of an Appendix 1 listed impairment was warranted.

### C. RFC Determination

Plaintiff further avers that the ALJ "announce[d] an RFC without a rationale or a functional analysis." Pl.'s Br. at 6; see also id. at 26–33. Once again, the Court disagrees.

The RFC assessment reflects the most a claimant can still do despite his or her limitations and is based on all relevant evidence in the claimant's case record. See 20 C.F.R. § 404.1545(a)(1)–(3). Here, the ALJ sufficiently accounted for Plaintiff's mental impairments and determined that, based on the record, she could perform simple tasks with few workplace changes, occasional decision-making, and occasional interaction with supervisors, coworkers, and the public. See id. The ALJ explained that his RFC analysis was influenced by Plaintiff's "symptom response [to] medication and unremarkable mental exams." Id. at 25. As previously noted, that positive symptomatic response has ample support in the record. See supra at 14–15. Indeed, APN Oledimmah's treatment notes further confirm this conclusion, as they repeatedly indicate that Plaintiff's medication has mitigated symptoms related to her mental impairments. See, e.g., id. at 393, 397, 418–20, 429, 457. And Plaintiff's symptom management manifested positive results in her mental status examinations. For example, the ALJ pointed to Dr. Goraya's mental status examination of Plaintiff from April 1, 2022, where Plaintiff "denied any psychological issues," and her "mood and affect were normal; speech was fluent; and she was well groomed." Id. at 26, 578.

Leaving no stone unturned, the ALJ also considered the potential impact of Plaintiff's non-severe physical impairments (diabetes and obesity) on her ability to perform work functions. See

id. at 26.  As previously emphasized, a diagnosis alone will not support a finding that a claimant's ability to perform work functions is impaired; there must be objective medical evidence showing the condition significantly hampers the Plaintiff's ability to perform basic work activities.  See Salles, 229 F. App'x at 145; see also Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991).

Here, Plaintiff offers no medical evidence to establish that her diagnosed obesity or diabetes impairs her ability to perform basic work activities.  Plaintiff merely refers to her body mass index of more than 40 to support the position that her weight could potentially impact work-related activities.  See Pl.'s Br. at 40.  But this too is ipse dixit.  And Plaintiff's medical records actually paint a contrary picture.  With respect to her weight, Plaintiff's medical records consistently describe normal performance during physical examinations.  See e.g., Tr. at 510, 513, 519, 523–26, 541–42, 557, 563–64, 567.  With respect to diabetes, the medical records also repeatedly classify Plaintiff's condition as "without complications," see e.g., id. at 506–07, 512, 515, 517–18, 521–22, 532–34, 538–39, 543–44, 548, 551, 553, 559–60, 565, 571, 573, and as medically controlled with medication and not severe, see id. at 65, 76.

The ALJ's RFC analysis is also consistent with the opinions of Dr. Clark, Dr. Wieliczko, and LCSW Bruno.  Dr. Clark concluded that Plaintiff had "no limitations in understanding, remembering or applying information; moderate limitations in interacting with others; mild limitations in concentration, persistence or maintaining pace; [and] mild limitations in adapting or managing oneself."  Id. at 26, 65–69.  Dr. Wieliczko affirmed these findings upon reconsideration.  See id. at 26, 76–81.  More specifically, Dr. Wieliczko found that Plaintiff could carry out complex instructions, perform tasks on a sustained basis, adapt to mental demands of most new tasks, and cooperate effectively with others.  See id. at 79.  Similarly, LCSW Bruno found that Plaintiff

17

maintained "good and fair ability in all areas except for poor/no ability in relating predictably in social situations." Id. at 26–27, 594–96.

In short, the ALJ used pertinent medical evidence and testimony in formulating Plaintiff's RFC, and his determination is supported by substantial evidence in the record.

### D.    Findings at Step Five

Finally, Plaintiff argues that the ALJ failed to consider relevant vocational testimony and Plaintiff's moderate limitations at step five. See Pl.'s Br. at 34–38. The Court finds otherwise.

After ascertaining a claimant's RFC, the ALJ must determine whether "work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] residual functional capacity and vocational factors." 20 CFR 416.960(c)(2). The examination typically consists of "one or more hypothetical questions posed by the ALJ to [a] vocational expert." Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). The ALJ must use their findings at steps two and three of the evaluation to inform their determination of Plaintiff's ability to engage in work at step five. See Hess v. Comm'r Soc. Sec., 931 F.3d 198, 209 (3d Cir. 2019). The ALJ's findings at steps two and three, however, need "not necessarily translate to the language used at steps four and five." Id. Stated differently, the ALJ has latitude to use a "wide range of limitation language" in their analysis of a claimant's ability to work, "so long as the chosen limitation language is explained." Id.

At the July 15, 2022 hearing, a vocational expert testified that Plaintiff could perform unskilled work at light and medium exertional levels. See id. at 28, 54. The vocational expert further testified that eight absences per year, any unscheduled fifteen-minute break, or a production level below ninety percent would preclude Plaintiff from employment. See id. at 54–55. Plaintiff runs with this testimony and claims that her panic attacks and outpatient treatment schedule would require her to be absent from work more than eight times per year. See Pl.'s Br. at 35–36. The

ALJ, however, cited to mental status examinations that indicated Plaintiff could "persist at tasks within physical tolerance and skill levels for an eight-hour day." Tr. at 79. And Plaintiff provides no evidence to support the position that she must schedule treatment or therapy sessions during work hours that would require her to be absent from work more than eight times each year.

The ALJ also properly accounted for Plaintiff's moderate limitations in the RFC evaluation. In Hess, the Third Circuit affirmed an ALJ's determination that a claimant could perform a job with a "simple tasks" limitation in place, even though the claimant faced "moderate limitations" in concentration, persistence, or pace. See 931 F.3d at 209–210. It explained that this conclusion was permissible because the ALJ offered a "valid explanation" for why a "simple tasks" limitation is appropriate in light of the claimant's moderate limitations in concentration, persistence, or pace. Id. at 210–11.

Here, the ALJ explained that the moderate limitations Plaintiff experiences in concentration, persistence, and pace would not impact her ability to perform jobs involving "simple instructions," "few workplace changes," and "occasional interaction with supervisors, coworkers, and the public." Tr. at 24. He justified this conclusion—and his reference to these specific "simple tasks"—with a "valid explanation" based heavily on Plaintiff's medical records, which establish that Plaintiff has the ability to communicate, think logically, and enjoy abated symptoms and an improved mood with medication and treatment. See id. at 25–26, 393, 397, 416–17, 429, 457. The ALJ also cited the medical opinions proffered by Dr. Wieliczko, Dr. Clark, and LCSW Bruno, which, in totality, establish that Plaintiff can persist, maintain pace, and follow basic instructions, but can struggle specifically with social interactions. See id. at 26–27, 66, 76, 594–95. Simply put, his "simple task[]" limitations are tailored to the medical evidence in the record.

19

In turn, his step five conclusion is justifiable, even in light of his conclusion that Plaintiff experiences moderate limitations in concentration, persistence, or pace.

## IV.    CONCLUSION

For the foregoing reasons, the determination of the Commissioner is hereby **AFFIRMED**.

Date: 04.07.2026                                    *s/ Madeline Cox Arleo*
                                                    **MADELINE COX ARLEO**
                                                    **UNITED STATES DISTRICT JUDGE**

20